**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MARK EDWARD PARTNERS LLC,

                         Plaintiff,

          v.

WILLIAM P. COSGROVE; LOCKTON INSURANCE
BROKERS, INC.,

                        Defendants.

Case No.

**<u>DEMAND FOR JURY TRIAL</u>**

---

<u>**COMPLAINT**</u>

Plaintiff Mark Edward Partners LLC ("MEP"), through its counsel, Cahill Gordon & Reindel LLP, brings this Complaint against Defendants William P. Cosgrove ("Cosgrove") and Lockton Insurance Brokers, Inc. ("Lockton" and collectively with Cosgrove, "Defendants") and states as follows:

<u>**NATURE OF THE ACTION**</u>

1.     This case arises out of Cosgrove's blatant breach of his September 4, 2018 non-compete and non-solicitation agreement (the "Non-Solicit/Compete Agreement," attached as Exhibit A hereto) with MEP, his former employer, in the course of his duties for his present employer, Lockton to the detriment of MEP and the benefit of Cosgrove and Lockton.

2.     MEP is an insurance brokerage firm, as is Lockton.

3.     MEP and Lockton are direct competitors.

4.     During Cosgrove's tenure with MEP, which lasted from September 5, 2018 until March 12, 2020, he was in charge of MEP's Financial Services Unit.  Cosgrove worked on several

- 2 -

projects to develop new programs and bring in new clients to MEP. Cosgrove was paid a substantial salary, $200,000 per annum, and had two subordinates assisting him who together earned $250,000 per annum. MEP also paid for their employee benefits, overhead, burden and expenses, including multiple trips to London by Cosgrove to develop business. In March 2020, just as several of these projects had come or were about to come to fruition, Cosgrove abruptly resigned from MEP and took these projects with him to Lockton.

5.      Upon information and belief, Lockton is paying Cosgrove a substantial salary predicated upon the business opportunities and confidential information Cosgrove usurped from MEP.

## PARTIES

6.      MEP is a New York limited liability company with its principal place of business at 505 Park Avenue, New York, New York.

7.      Defendant Cosgrove is a citizen of New Jersey.

8.      Upon information and belief, Lockton is a California corporation with its principal place of business in Kansas City, Missouri.

## JURISDICTION & VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because: (1) there is complete diversity of citizenship between MEP and Defendants; and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.      Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS

11.      MEP is a national, full-service, boutique insurance brokerage firm.

- 3 -

12.     Lockton represents itself as being "the world's largest independent insurance brokerage" firm.

13.     MEP hired Cosgrove to head up its Financial Services Unit.  In such position, he spent hundreds of hours working on development new programs with long lead times which were tailored to the needs of MEP's prospective clients.

14.     For example, for Client A, a large private equity and money management firm, Cosgrove, while drawing a salary from MEP, along with others at MEP, developed a novel program to provide directors and officers ("D&O") insurance to Client A's portfolio companies. Cosgrove had never serviced the Client A account prior to his joining MEP.  His work on the Client A account at MEP included participation in a request for proposal process in January 2019 among multiple competitors in which MEP was determined to be the successful bidder.  Cosgrove traveled to London, at MEP's expense, in March 2019 to negotiate the placement and wordings for this program and developed a manuscript policy form.  The work product of Cosgrove and others at MEP on this account constituted confidential trade secret information of MEP.  Cosgrove estimated that the commission revenues to MEP for this D&O insurance program would be approximately $500,000 per year.  Upon information and belief, Cosgrove is now working on this D&O placement for Client A while at Lockton based on the confidential trade secret information he learned while at MEP and the substantial investment by MEP in developing the D&O program.

15.     Also for Client A, Cosgrove was working on a program to place political risk insurance for which he estimated that the commission revenues for MEP would be $25,000 per quarter for the second, third and fourth quarters of 2020.  This illustrates the potential of the Client A account for additional business, which potential was lost when Cosgrove diverted the relationship from MEP to Lockton.

- 4 -

16.     For Client B, another account for which Cosgrove never previously booked business, MEP placed professional liability, cyber and D&O insurance, generating approximately $25,000/year in commission revenues.   Shortly after Cosgrove left MEP, MEP received notification that a broker of record letter was received in favor of a competitor.  Upon information and belief, that competitor is Lockton.

17.     For Client C, another account for which Cosgrove never previously booked business, Cosgrove while at MEP spent a great deal of time, for which he was compensated by MEP, helping Client C raise money (listing  himself as "Funding Round Advisor" in a power point deck used to pitch prospective investors).   Cosgrove estimated that the D&O and errors and omissions insurances alone for this account would generate $125,000/year in commission revenues, and in an email dated September 2, 2019 predicted that this would become one of MEP's largest accounts.  Upon information and belief, Cosgrove has now diverted this relationship to Lockton.

18.     For Client D, Cosgrove developed a new program, at MEP's expense, to provide crime coverage, which was booked at MEP during September 2019, with projected commissions of approximately $620,000.   In February 2020, Cosgrove said that commissions would be $480,000 on the first $500 million of limits and that the account requested placement of $1 billion in limits.  MEP is due any commissions received by Lockton on this placement.

19.     For Client E, a start-up which Cosgrove had not previously serviced, MEP bankrolled considerable efforts to develop the account, including not only compensation of Cosgrove and his subordinates but also two trips to London.  In particular, Cosgrove worked on developing credit and construction insurance for this account.  Client E owes MEP a retainer of $500,000, which if collected by Lockton must be remitted to MEP.

- 5 -

20.     For Client F, another account developed while Cosgrove was working for MEP, Cosgrove again assisted the client, at MEP's expense, to raise capital and met with the client in London at MEP's expense.  Cosgrove projected that this account would generate in excess of $100,000/year in commissions for D&O, errors and omissions and credit insurance.  Upon information and belief, Cosgrove and Lockton are soliciting this account.

21.     For Clients G and H, also developed while Cosgrove was working for MEP, Cosgrove worked on placements for errors and omissions insurance with projected commissions of $15,000/year each.  Upon information and belief, Cosgrove and Lockton are soliciting these accounts.

22.     The Non-Solicit/Compete Agreement specifically included a non-exhaustive list of "Confidential Information" which included, among other things, the identity of MEP's past, present and prospective clients, its distribution networks, pricing and premium information relating to clients, identity of underwriters from which MEP obtains coverages, the terms and conditions of such coverages, types of insurance purchased by clients, transactions in which clients are engaged or are considering engaging and MEP's business strategies.

23.     Upon learning of Cosgrove's employment with Lockton, MEP through its counsel sent a letter, dated March 16, 2020, to Cosgrove, copied to the United States General Counsel of Lockton Companies (upon information and belief the parent of Lockton), reminding Cosgrove of his obligations under the Non-Solicit/Compete Agreement and enclosing a copy thereof.  This letter specifically named clients, including, without limitation, Clients A through H, which Cosgrove directly or indirectly is precluded from soliciting and servicing for a twelve-month period.

- 6 -

24.     Following the March 16, 2020 letter, MEP learned that Cosgrove had solicited at least one account of MEP, Client B.  MEP through its counsel sent another letter, dated March 20, 2020, to the United States General Counsel of Lockton Companies demanding that Lockton cease and desist from approaching any MEP clients and requesting that Lockton place a document destruction hold on all emails and documents constituting or reflecting communications with MEP clients.

## COUNT ONE
### (Breach of Contract Against Cosgrove)

25.     MEP incorporates the above allegations as if fully set forth herein.

26.     By virtue of the foregoing conduct, Cosgrove has violated the Non-Solicit/Compete Agreement.

27.     The Non-Solicit/Compete Agreement is valid and enforceable under New York law.

28.     Pursuant to the Non-Solicit/Compete Agreement, Cosgrove agreed that for a period of 12 months after termination of his employment with the Company he would not directly or indirectly perform services competitive with those of the Company or similar to any services he performed while an employee of the Company for any customer, client or prospective customer or client of the Company for which Cosgrove had access to Confidential Information during the 12 months prior to his date of termination ("MEP Accounts").  Cosgrove flatly breached this Agreement.

29.     As a consequence of Cosgrove's breaches of the Non-Solicit/Compete Agreement, MEP seeks actual, incidental, compensatory and consequential damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial but no less than the greater of (a) a multiple of twice the annual commission revenues received by Lockton as respects MEP

- 7 -

Accounts, or (b) the sum of all compensation (including salary and benefits), overhead, burden and expenses paid to Cosgrove and his two subordinates during the period of Cosgrove's employment with MEP, in each case plus interest and reasonable attorneys' fees and costs.

### COUNT TWO
### (Tortious Interference Against Lockton)

30.     MEP incorporates the above allegations as if fully set forth herein.

31.     As a result of retaining Cosgrove, Lockton became familiar with the business relationships that existed between MEP and the MEP Accounts.

32.     Upon information and belief, Lockton used MEP's Confidential Information and trade secrets obtain from Cosgrove in violation of the Non-Solicit/Compete Agreement to solicit the MEP Accounts and interfere with MEP's rights under the Non-Solicit.Compete Agreement and MEP's contractual and other prospective economic relationships with clients.

33.     Upon information and belief, Lockton in retaining Cosgrove and unlawfully exploiting his knowledge of MEP Confidential Information and trade secrets sought to obtain an unfair advantage in its competition with MEP and to damage or injure MEP's business, goodwill, reputation and standing in the marketplace.

34.     Notwithstanding Lockton's awareness of the Non-Solicit/Compete Agreement (forwarded to it by MEP on March 16, 2020), Lockton intentionally, with malice, and without privilege or justification, interfered with MEP's contractual and prospective economic relationships with MEP Accounts, including upon information and belief, without limitation, Clients A though H, using unfair or improper means and with the intent to interfere with such relationships.

35.     MEP possesses a protectable interest in its relationships with clients and prospective clients in that it has a reasonable expectation of their continued association with MEP.

- 8 -

36.     As a consequence of Lockton's unlawful conduct, MEP seeks actual, incidental, compensatory (not less than a multiple of twice the annual commission revenues received by Lockton as respects MEP Accounts), punitive and consequential damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial.

## COUNT THREE
### (Unjust Enrichment Against Lockton)

37.     MEP incorporates the above allegations as if fully set forth herein.

38.     Lockton has unlawfully usurped MEP's business and opportunities with Clients A through H after MEP funded the investment necessary to develop such business and opportunities and bring them near to fruition.

39.     Lockton in retaining Cosgrove and permitting him to solicit and service Clients A through H seeks to step in at the last minute, after most or all of the development work has been done, and reap the rewards of MEP's efforts.

40.     As a consequence of Lockton's inequitable conduct, MEP seeks actual, incidental, compensatory and consequential damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial but no less than the greater of (a) a multiple of twice the annual commission revenues received by Lockton as respects MEP Accounts, or (b) the sum of all compensation (including salary and benefits), overhead, burden and expenses paid to Cosgrove and his two subordinates during the period of Cosgrove's employment with MEP, in each case plus interest and reasonable attorneys' fees and costs.

## COUNT FOUR
### (Misappropriation of Trade Secrets Against Cosgrove and Lockton)

41.     MEP incorporates the above allegations as if fully set forth herein.

- 9 -

42.     By virtue of his employment with MEP, Cosgrove had access to Confidential Information and trade secrets of MEP, including, but not limited to, the identity of MEP's clients and prospective clients, the details of the products and services developed for those clients, the available markets for the insurances, MEP's strategies, etc.  This information is not generally known to competitors of MEP,  The concepts have been developed by MEP over many months and reflect hundreds of hours of work and the expenditure of substantial financial resources invested in generating and assisting MEP's clients and prospective clients.  Pursuant to the Non-Solicit/Compete Agreement, Cosgrove was obligated to hold such information confidential in a fiduciary capacity for the benefit of MEP.

43.     Cosgrove and Lockton were aware that the information as described above is confidential, was acquired under circumstances giving rise to a duty to maintain its secrecy, was developed or acquired by MEP at great expense and effort, has been maintained as confidential and is not generally available to MEP's competitors, would provide significant benefit to Lockton to the detriment of MEP.

44.     Defendants' misappropriation of MEP's Confidential Information and trade secrets has been willful and malicious because, upon information and belief, this was the basis for Lockton retaining Cosgrove.

45.     As a consequence of Cosgrove's and Lockton's inequitable conduct, MEP seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial but no less than the greater of (a) a multiple of twice the annual commission revenues received by Lockton as respects MEP Accounts, or (b) the sum of all compensation (including salary and benefits), overhead, burden

and expenses paid to Cosgrove and his two subordinates during the period of Cosgrove's employment with MEP, in each case plus interest and reasonable attorneys' fees and costs.

## COUNT FIVE
### (Unfair Competition Against Cosgrove and Lockton)

46.     MEP incorporates the above allegations as if fully set forth herein.

47.     By misappropriating MEP's Confidential Information and trade secrets, and upon information and belief by making this the predicate for Cosgrove's retention by Lockton, Lockton is gaining an unfair advantage in competing with MEP.  Such competition is based on Cosgrove's violation of the Non-Solicit/Compete Agreement and his unique knowledge of the products and services developed for Clients A through H.  Accordingly, Cosgrove and Lockton are affecting the marketplace by orchestrating and interfering with MEP's legitimate business expectancies.

48.     MEP seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and costs.

## COUNT SIX
### (Breach of Duty of Loyalty Against Cosgrove)

49.     MEP incorporates the above allegations as if fully set forth herein.

50.     At all times during his employment with MEP, Cosgrove owed MEP a duty of loyalty and, among other things, a duty to maintain the secrecy of MEP's Confidential Information and trade secrets.

51.     Upon information and belief, Cosgrove during his tenure at MEP marketed himself and his services to Lockton and perhaps others on the basis that he could deliver to his prospective new employer the consummation of the transactions on which he was working at MEP to the detriment of MEP.

- 11 -

52.     Cosgrove willfully and intentionally breached his duty of loyalty to MEP by engaging the such conduct in conscious disregard of MEP's rights.

53.     MEP seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, MEP demands the following relief:

1.     Actual compensatory, incidental and consequential damages in an amount to be proven at trial;

2.     Punitive damages in an amount to be proven at trial due to Defendants' willful and malicious conduct;

3.     Costs and expenses incurred herein, including reasonable attorneys' fees and interest; and

4.     Any other relief the Court deems appropriate and proper.

Dated:  May 15, 2020


Respectfully submitted,

/s/ Thorn Rosenthal

THORN ROSENTHAL
**CAHILL GORDON & REINDEL LLP**
80 Pine Street, 17th Fl.
New York, NY 10005
Phone: (212) 701-3000
trosenthal@cahill.com